# UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

Michael S. Kasanoff, Esq. (N.J. Bar No.: 035751993)
**MICHAEL S. KASANOFF, LLC**
9 Stillwell Street
Matawan, NJ 07747
Phone:  (908) 902-5900
Fax:      (732) 741-7528
Email: mkasanoff@att.net

*Attorneys for Plaintiff The Estate of Frances D. DeRosa by and through her Administrator Prosequendum, Lisa DeRosa-Palisi*

|  |  |
|---|---|
| THE ESTATE OF FRANCES D. DEROSA, BY AND THROUGH HER ADMINISTRATOR PROSEQUENDUM, LISA DEROSA-PALISI, | : <br> : <br> : <br> : Civil Action No. 3:22-cv-2301(ZNQ)(TJB) |
| Plaintiff, | : |
| vs. | : |
| PHILLIP D. MURPHY, the Governor of the State of New Jersey, in his individual capacity, JUDITH M. PERSICHILLI, Commissioner of the New Jersey Department of Health, in her individual capacity, GATEWAY CARE CENTER, LLC d/b/a GATEWAY CARE CENTER n/k/a SHORE POINTE CARE CENTER, JONATHAN ROSENBERG, YEHUDAH KRAMER, a/k/a "JAY" KRAMER, LNHA, and JOHN DOES A-Z, | : **AMENDED COMPLAINT** <br> : **AND JURY DEMAND** <br> : <br> : <br> : <br> : <br> : <br> : <br> : <br> : |
| Defendants. | : |

1

Plaintiff, the Estate of Frances D. DeRosa by and through her Administrator Prosequendum, Lisa DeRosa-Palisi (the "Estate" or "Plaintiff"), through its attorneys, by way of Complaint against Defendants Phillip D. Murphy, the Governor of the State of New Jersey, in his individual capacity; Judith M. Persichilli Commissioner of the New Jersey Department of Health, in her individual capacity; (Governor Murphy and Commissioner Persichilli collectively referred to as "the New Jersey Defendants"); Gateway Care Center, LLC d/b/a Gateway Care Center n/k/a Shore Pointe Care Center ("Gateway"); Jonathan Rosenberg ("Rosenberg"); Yehudah Kramer a/k/a "Jay" Kramer, LNHA ("Kramer"); (Gateway, Rosenberg, and Kramer collectively referred to as "the Nursing Home Defendants"); and John Does A-Z (all collectively referred to at times as "Defendants") says:

## JURISDICTION AND VENUE

The Court has jurisdiction pursuant to 28 U.S.C. § 1331, 28 U.S.C. § 1343(a)(3), 28 U.S.C. § 1343(a)(4), 28 U.S.C. § 1367, and 42 U.S.C. § 1983. The amount in controversy exceeds $75,000, exclusive of interest and costs. Venue is appropriate in this judicial district under 28 U.S.C. § 1391(b)(1) and 28 U.S.C. § 1391(b)(2).

## PARTIES

### Plaintiff

1.      Plaintiff, the Estate of Frances D. DeRosa by and through her Administrator Prosequendum, Lisa DeRosa-Palisi, is the Estate of the decedent, Frances D. DeRosa ("Frances"). The decedent, a resident of Gateway, was diagnosed with Covid-19 ("Covid") on April 20, 2020, and died of Covid on April 27, 2020 at the age of 73. Lisa DeRosa-Palisi ("Lisa") is the daughter of Frances D. DeRosa, and the executrix of the Estate. The Estate is located at 21 August Court, Unit 6, Freehold, NJ 07728.

2

**Defendants**

2.      Defendant Phillip D. Murphy is the Governor of New Jersey. His address is 225 W. State Street, Trenton, NJ 08625.

3.      Defendant Judith M. Persichilli Commissioner of the New Jersey Department of Health. Her address is 369 South Warren Street, Trenton, NJ 08608-2308.

4.      Defendant, Gateway Care Center, LLC d/b/a Gateway Care Center n/k/a Shore Pointe Care Center ("Gateway") was a the licensed owner/operator of that certain licensed nursing home, long term health care facility and/or a nursing facility commonly known as Gateway Care Center located at 139 Grant Avenue, Eatontown, New Jersey 07724 ("the Facility").

5.      Defendant Jonathan Rosenberg (hereinafter "Rosenberg") was, according to public filings and the licensure file for the Facility, the principal owner of the Facility and/or the managing member of Defendant, Gateway.

6.      Defendant Yehudah Kramer a/k/a "Jay" Kramer, LNHA ("Kramer") was the licensed administrator for the Facility.

7.      John Does A-Z are other individuals and/or entities, whose identities and involvement can only be ascertained through further discovery.

## BACKGROUND

### The New Jersey Defendants Violated Plaintiff's Constitutional Rights

8.      On March 9, 2020, Governor Murphy issued Executive Order No. 103 ("EO 103") declaring a Public Health Emergency in New Jersey as a result of the COVID-19 pandemic.

9.      In conjunction with the implementation of EO 103, on March 31, 2020, Commissioner Persichilli issued a Directive entitled "Hospital Discharges and Admissions to Post-Acute Care Settings" ("the Directive").

10.     The Directive specifically with emphasis, ordered that post-acute care facilities such as Gateway, are expressly prohibited from denying admission or re-admission of patients/residents who have tested positive for Covid.

11.     The Directive specifically with emphasis, also prohibited post-acute care facilities such as Gateway from requiring hospitalized patients/residents who were determined to be "medically stable", to be tested for Covid prior to admission/re-admission.

12.     During a conference call immediately after the issuance of the Directive, the New Jersey Defendants were warned that the Directive would lead to unnecessary deaths, as it is indisputable that the elderly are the most vulnerable to the ravages of Covid, and the most likely to die en masse due to a Covid outbreak.

13.     On a conference call with various nursing home administrators immediately after issuing the Directive, Commissioner Persichilli was warned by an unnamed administrator that people would "die" should the infected residents be admitted.

4

14.     The administrator said, "People will die .... You understand that by asking us to take Covid patients that patients will die in nursing homes that wouldn't have otherwise died had we screened them out."

15.     On that same call, after Commissioner Persichelli shared guidelines for separating returning residents and their caretakers, an administrator replied, "You have asked us to separate safely and create our own wing to take on COVID-19's from the hospital .... The problem, of course, is there is no separating safely .... It's almost certain that even though you have staff on that unit, something will migrate."

16.     The day after the conference call, the New Jersey Department of Health was inundated with calls from 99 facilities stating that they did not have enough resources to properly staff or separate patients. Within a week, 200 facilities notified the New Jersey Department of Health that they could not accept new admissions.

17.     Just a day after Commissioner Persichelli issued the Directive, three organizations, The Society for Post-Acute and Long-Term Care Medicine ("AMDA"), the National Center for Assisted Living ("NACL"), and American College of Health Care Administrators ("CHCA"), all describing themselves as dedicated to preserving the safety of patients, residents, and other long-term care facilities, issued a dire warning about New York's directive, from which Commissioner Persichelli's Directive is modeled.

18.     They urged other states not to enforce the kind of policy being implemented in New York and New Jersey. They presented COVID data from the Washington State nursing home which was ravaged by Covid, and explained why a one-size fits all approach statewide could be dangerous.

19.     Their joint statement continued, "We strongly object to this policy directive and approach to developing surge capacity. We are aware that other states may already be adopting a similar approach in order to free up hospital beds. This is a short-term and short-sighted solution that will only add to the surge in COVID-19 patients that require hospital care. Based upon what we **currently know** about how this virus can spread in institutional settings, the hospitalizations and case fatality rate, this action by a state will put the many frail and older adults who reside in nursing homes at risk."

20.     These experts went on to advocate the creation of separate settings for recovering Covid patients, including large field hospitals, dormitories, hotels, and shuttered nursing homes or hospitals. In other words, keep the virus out of facilities by isolating Covid positive patients from the extremely vulnerable elderly.

21.     Thus the New Jersey Defendants cannot credibly claim that there was no alternative to the Directive, as they knew that there were multiple viable alternatives, but ignored them to the detriment of the decedent, Frances D. DeRosa, and 10,000 other elderly and infirm nursing home patients who died horrible Covid deaths while scared and alone.

22.     The New Jersey Defendants' refusal to have hospitals test patients during discharge greatly exacerbated the disaster, as the combination of staff who live in the community, going home and coming back to the building, combined with the positivity rate in these communities, especially in 'hot spots', strongly contributed to the high rate of deaths, after patients were admitted and re-admitted while not knowing whether they had Covid because they were prohibited from being tested.

23.     The New Jersey Defendants knew from the outset that the Directive was completely unworkable as they knew that most nursing homes are small, older buildings without upgraded ventilation.

24.     The New Jersey Defendants also knew that the nursing homes, eager for new revenue that came with hospital patients, would gladly accept this patients, yet the New Jersey Defendants did nothing substantive to prevent the deadly combination of inadequate facilities with an overflow of Covid patients. In fact, through the Directive, this deadly combination was encouraged by the New Jersey Defendants.

25.     Indeed, on March 18, 2020, the CDC in a study of the nation's first large outbreak in the Kirkland, Washington nursing home, told health officials, "Substantial morbidity and mortality might be averted if all long-term care facilities take steps now to prevent exposure of their residents to COVID-19." Instead, the New Jersey Defendants through the Directive, did the exact opposite.

26.     The New Jersey Defendants were forewarned by Washington State, and were forewarned by Italy where it was learned that the disease was ravaging the elderly population with an average age of death being 81. Instead of consulting the Legislature, Governor Murphy assumed near dictatorial powers. Instead of protecting the already vulnerable elderly, the New Jersey Defendants further endangered them through the Directive.

27.     It has been said that the single greatest error of America's response to the pandemic in nursing homes, was the failure to provide early and vast access to virus testing for residents and staff. Without testing, nursing home staff focused on isolating residents who showed symptoms of the virus, while asymptomatic residents and staff continued to spread the virus throughout the

facilities. This is exactly what the plain language of the Directive accomplished. Without widespread testing, efforts to stop the spread were doomed.

28.     To make matters worse, the New Jersey Defendants had no plan in place to distribute personal protective equipment ("PPE") equipment to nursing homes in the early days of the crisis, as there was a breakdown in communications between such facilities and government officials.

29.     New Jersey's long-term care facilities warned the New Jersey Defendants that they did not have sufficient supplies of PPE or the ability to manage the highly infectious patients that the New Jersey Defendants were forcing them to accept from hospitals. Yet the New Jersey Defendants implemented the Directive anyway.

30.     The whistle was blown by a group of New Jersey Department of Health Employees known as the "NJ Pandemic Response Team", who in an open letter to the Legislature ("the Letter"), publicly exposed the dark underbelly of the New Jersey Defendants' deliberate indifference which resulted in the highest per-capita nursing home Covid death rate in the nation.

31.     In the Letter, they state that it took the biggest health crisis of the last century for them to realize that as the experts, they would not be called upon to guide the decision-making of our leaders, as the top brass specifically asked them to "avoid putting any concerns in email."

32.     The Letter expressly accuses the New Jersey Defendants of making things up as they went along, and making decisions while justifying them on the back end.

33.     After being alarmed about the tragic outcomes at the nursing home in Washington State, the authors of the Letter advocated for a greater allocation of both PPE and test kits for long-term care centers towards the end of March, 2020.

34.     The authors clamored for more testing for nursing homes, so that long-term care facilities could begin cohorting residents and dedicating specific staff to serve those residents, to minimize spread. They warned that without having that critical testing information, and the PPE to be able to protect staff, nursing home residents would face devastating outcomes.

35.     The Letter states that Commissioner Perischilli pressured subordinates to relax standards for testing, so that nursing home staff could be given the authority to test with the paltry PPE supplies offered by the State Office of Emergency Management.

36.     The authors contend that all of this was in service to the Governor Murphy's arbitrary testing goals (set with political lenses in mind), without regard for the safety of those who needed to do the testing. The State OEM office then used arbitrary allocation guidelines that short-changed nursing homes, where the most vulnerable New Jersey residents live when it comes to this virus.

37.     The Letter states that it was a complete failure on the part of the New Jersey Defendants, to ignore long-term care testing until late April, 2020, a failure particularly detrimental to Frances D. DeRosa, who was diagnosed with Covid on April 20, 2020, and died from Covid on April 27, 2020.

38.     The authors confirm that very few of these nursing homes were tangibly ready to take these residents back based on Commissioner Persichilli's criteria set forth in the Directive, because the State failed to allocate enough PPE and staffing resources to them to do so. And with Commissioner Persichilli, a former hospital CEO at its helm, the Department of Health was only focused on the acute care hospital piece of the health care system.

39.     The authors insisted that the PPE allocation system prioritize long-term care centers with vulnerable populations, but their voices were suppressed by the New Jersey Defendants and/or their delegees.

40.     Not only were their concerns unaddressed by the New Jersey Defendants, but in many cases, people were punished, suppressed, or otherwise reprimanded for using their public health expertise to recommend the right course of action.

41.     According to the authors, the combination of a lack of action where it should have been seen, and a willful desire to focus only on where most media attention was afforded during the peak of the crisis (the general public and hospitals), caused preventable deaths in long-term care, prisons, and other institutions, meaning that the leadership failures of the New Jersey Defendants resulted in preventable deaths.

42.     The Letter chronicles that the New Jersey Defendants' failures were further exacerbated by Commissioner Persichilli's creation of layers in the Department of Health between her and the experts (rather than elevating the voices that could have resulted in a better response), and  due to the emergence of a toxic culture of infighting in Governor Murphy's administration that prevented the right decisions from being made early enough to have an impact.

43.     Despite all of these warnings, and all of the insurmountable real world logistical obstacles, the New Jersey Defendants dogmatically in a tone-deaf fashion, exercised deliberate indifference by implementing the Directive anyway.

44.     The New Jersey Defendants had all of the expert information on what to do, and cannot say that they were not warned, and as a result, cannot credibly assert an objectively reasonable reliance on existing law. There is no doubt that through the Directive, the nursing homes were thrown under the bus.

45.     As a direct and proximate result of the New Jersey Defendants' deliberate indifference through the promulgation of EO 103 in conjunction with the Directive, approximately 10,000 elderly New Jersey nursing home and veteran's home residents lost their lives.

46.     As a direct and proximate result of the New Jersey Defendants' deliberate indifference through the promulgation of EO 103 in conjunction with the Directive, New Jersey's nursing homes suffered the worst per-capita Covid death rate in the entire country.

47.     As a direct and proximate result of the New Jersey Defendants' deliberate indifference through the promulgation of EO 103 in conjunction with the Directive, New Jersey's nursing homes  suffered a death rate of 16%, which was four times the death rate at the Battle of the Bulge.

48.     As a direct and proximate result of the New Jersey Defendants' deliberate indifference through the promulgation of EO 103 in conjunction with the Directive, the decedent, Frances D. DeRosa, age 73, caught Covid on April 20, 2020, and died a horrible death on April 27, 2020, alone and scared like so many of her counterparts.

49.     Governor Murphy has characterized New Jersey's nursing home deaths as a "tragedy within a tragedy." Governor Murphy acknowledged that "we were clobbered, we lost thousands of people and we mourn the loss of every of those lives."

50.     After the State of New Jersey reached a $53 million settlement with the families of 119 seniors who died in two State-run veterans' homes, Governor Murphy said, "Count me on the list of folks who hope that this allows some amount of step in the right direction for the blessed loved ones left behind. Nothing can literally replace the loss of a loved one but god willing it's a step in the right direction of healing and resolution."

51.     Frances D. DeRosa was a blessed loved one left behind. Nothing can literally replace her loss, but her Estate now seeks appropriate healing and resolution, as Frances's life meant something, and she did not deserve to die such a preventable death.

### The Nursing Home Defendants Were Grossly Negligent

52.     On or about March 12, 2020, Lisa DeRosa-Palisi returned with her mother Frances DeRosa from a visit with her mother at Gateway. Frances had been a Gateway resident for 4 years due to numerous health conditions, including breast cancer, diabetes, COPD which caused her to need supplemental oxygen, and  a weight issue that complicated her health.

53.     After their coffee visit,  while bringing her mother back to her room, Lisa was contacted by Gateway's Administrator, Jay Kramer, who asked if he could speak privately with her. They went to his office where he proceeded to tell Lisa that the State of New Jersey was ordering a shut down of the Facility due to the fear of Covid.

54.     Lisa was not comfortable with this and asked to view the directive that came from Medicare/Medicaid to see the exact wording. The printout clearly said that if a resident had a family member who visited on a regular basis (Lisa was at Gateway a minimum of 5 days a week) and was important to the resident's mental well-being (Frances was also being treated for Schizophrenia and both Lisa and Gateway knew that no visits from Lisa would be devastating for Frances), special

12

arrangements could be made for that resident and visitor.

55.     Before pointing this out to Gateway, Lisa expressed complete disagreement with shutting her mother away, voiced tremendous concern, and said that she would be looking into her mother's options.

56.     Jay Kramer informed Lisa (who was her mother's Power of Attorney) that it was Lisa's right to look into other measures, but made it a point to tell Lisa that Gateway are the "trained professionals" and that Lisa would be more of a danger to Frances then Gateway would be.

57.     When Lisa questioned Mr. Kramer, he said that if Lisa took her mother anywhere outside of Gateway, she could be exposing her to the potentially deadly virus. Lisa pointed out that simply keeping family away from loved ones proved nothing as Gateway was still going to have all facility employees coming and going and putting the whole building at the same risk.

58.     Mr. Kramer replied that Gateway would be taking extra precautions such as sanitation,  hand washing, gloves, masks and daily temperature measurements of all employees. Given these specific representations, Lisa expressly relied upon those representations, and went against her gut feeling in full reliance upon all of Jay Kramer's assurances and decided to give it a try, as her mother's life meant everything to her.

59.     Lisa had worked very hard over the previous four years with all of her doctors to save her mother's life on more than one occasion.  She did not want to put her mother in danger. Before she fully agreed, she asked Mr. Kramer to honor what was stated in the Medicare/Medicaid print out, and arrange one day a week to let her see her mother in person until the two to three week time period was over (Mr. Kramer said that was the expected time line). He agreed only after informing Lisa that he had to be careful because he did not want to look like he was playing favorites. But Mr.

13

Kramer never kept his word.

60.     The first two weeks were unbelievably rough, as Frances was so sad and scared to the point where she told both her sister Patricia, and Lisa on more than one occasion that Gateway was doing none of what they had told Lisa they were going to do in terms of implementing the necessary protective measures against the virus. Frances told Lisa that Gateway was not employing any additional protective measures outside of what was normally done before the onset of the Pandemic.

61.     None of the nurses were wearing gloves or masks! This scared Frances because she could clearly see on the news every night that she had every pre-existing condition that was being reported as dangerous if the person was exposed to Covid.  At that point, it became very hard to get Mr. Kramer on the phone to discuss Frances's fears and when Lisa's Aunt Patricia finally got Mr. Kramer on the phone, he told her that gloves and masks were not necessary, in direct contradiction of what Lisa was told in the beginning.

62.     On March 31, 2020, the Directive was issued, ordering that post-acute care facilities such as Gateway, are expressly prohibited from denying admission or re-admission of patients/residents who have tested positive for Covid, while also prohibiting post-acute care facilities such as Gateway from requiring a hospitalized patients/residents who were determined to be "medically stable", to be tested for Covid prior to admission/re-admission.

63.     On April 3, 2020, Lisa received a phone call from Gateway informing her that Gateway had residents that had "tested positive" for Covid but Frances was ok. When Lisa asked how this happened, she was informed that there was nothing that Gateway could really do to stop it, which contradicted what Lisa was told in the beginning.

14

64.     On April 10, 2020, Lisa was informed that Frances was showing signs of Covid, but Gateway was not sure if it was only "seasonal allergies". Lisa basically told them that this was ridiculous and Frances needed to be tested.

65.     Lisa was told that the CDC would not allow Gateway to test Frances. Lisa argued and said there was a drive-thru testing site literally around the block. Any of Frances's doctors would give her a prescription and Lisa would take her. Gateway replied that if Lisa removed Frances, she could not come back.

66.     At that point, Lisa was thinking that if something was wrong, it was Gateway's responsibility to take care of her. Lisa asked Gateway three times over the next week to test Frances, but they would not do so. Finally when Frances was not doing well on April 17, 2020, Gateway had her tested seven days after informing Lisa that Frances may be sick.

67.     It took three days to get the results. On April 20, 2020, Lisa received the devastating news that Frances had Covid. Lisa thought that Gateway would have sent Frances to the hospital given all of her pre-existing conditions, but Gateway did not do so.

68.     Gateway claimed to be isolating and treating Frances at the Facility. On April 24, 2020, Lisa received a call that Frances's oxygen levels were dropping and she needed to go to the emergency room.  The next morning, Doctor Ross who became Frances's main doctor, informed Lisa that Frances was the poster child for who should not get this virus.  Sadly, on April 27, 2020, Frances died form Covid.

69.     Gateway did NONE of what they said they were going to do to protect Frances. The only outside people that Frances was isolated from, were the people who meant the most to her. She was isolated and denied the ability to see her family. She suffered immensely, and died alone.

15

70.     Governor Murphy has stated that "The uneven performance of this [the nursing home] industry is jaw-dropping, and that is as charitable as I can get."

71.     The Nursing Home Defendants were grossly negligent by misrepresenting that Gateway would be taking extra precautions such as sanitation, hand washing, gloves, masks and daily temperature measurements of all employees, and then not employing any of those measures during the relevant time period.

72.     The Nursing Home Defendants were grossly negligent by failing to test Frances for Covid after she began exhibiting Covid symptoms, and prohibiting Lisa from briefly taking Frances from the Facility to get tested.

73.     The Nursing Home Defendants were grossly negligent by failing to separate staff and residents who had tested positive for Covid, and for permitting residents and staff to congregate at the Facility even after the Nursing Home Defendants knew that some had tested positive.

74.     The Nursing Home Defendants were grossly negligent by allowing staff who were infected or presumed to be infected, to continue working and by preventing staff from gaining access to PPE.

75.     The Nursing Home Defendants were grossly negligent by failing to implement appropriate measures, such as infectious disease outbreak plans, and by treating Frances on-site for four days after her positive Covid diagnosis, rather than immediately rushing her to a hospital, especially considering her vulnerability due to her age and health morbidities.

76.     Had Lisa known that the Nursing Home Defendants were going to deliberately breach the trust that Lisa and Frances had placed in them, Lisa would have immediately pulled Frances out of Gateway, which more likely than not, would have saved Frances's life by sparing her the horrible

Covid death that she ultimately suffered.

77.    Adding insult to injury, the Nursing Home Defendants schemed to steal Frances's stimulus check, and upon information and belief, the stimulus checks of other residents, by opening Frances's mail, never giving her stimulus check to her, lying and telling both her and Lisa that they knew nothing about it, and then after Lisa's persistence exposed this scheme, the Nursing Home Defendants sent the stimulus check back to the IRS, rather than handing it over to Lisa, who was Frances's Power of Attorney. Why did they not give Frances's mail to Lisa, as they had ALWAYS done over the previous four years?

## FIRST COUNT

### (Civil Rights Act of 1871 - 42 U.S.C. § 1983 - the New Jersey Defendants)

78.    Plaintiff repeats, realleges, and re-emphasizes the allegations set forth in Paragraphs 1 through 77  as if set forth herein full, and as the basis for this claim.

79.    The New Jersey Defendants, at all times and in all events relevant hereto, have acted under the color of authority of the statutes of the State of New Jersey.

80.    The actions of the New Jersey Defendants, in violation of 42 U.S.C. § 1983, were performed under the color of authority of state statutes and/or the customs or usage of the State of New Jersey and have caused Frances to be deprived of her constitutionally guaranteed rights secured and guaranteed under the Fifth and Fourteenth Amendments of the United States Constitution, and corresponding rights guaranteed by the New Jersey State Constitution.

81.    The New Jersey Defendants palpably abused their discretionary authority in that their actions were in all regards arbitrary, capricious, unreasonable, and otherwise wrongful in violation of Frances's federal and state constitutional rights.

82.     Frances's interests have been adversely affected and manifest injustice has resulted from the New Jersey Defendants' arbitrary, capricious, and unconstitutional actions.

83.     Specifically the actions of the New Jersey Defendants as chronicled herein, were based upon improper motives and were:

      a.     arbitrary, capricious, unreasonable, and oppressive; and

      b.     based upon unlawful criteria.

84.     The New Jersey Defendants' aforementioned course of conduct against Frances was also:

      a.     not reasonably related to a legitimate government interest;

      b.     in fact motivated by bias, bad faith and/or improper motive; and

      c.     in and of itself, egregiously unacceptable and outrageous.

**The New Jersey Defendants' Violation of Multiple Clearly Established Rights Abrogates the Applicability of Qualified Immunity**

85.     While the judicially created doctrine of qualified immunity balances the need to hold public officials accountable for the irresponsible exercise of power, and the need to shield officials from harassment, distraction, and liability when they reasonably perform their duties, it is "no license to lawless conduct." *Peroza-Benitez v. Smith*, 994 F.3d 157, 164 (3d Cir. 2021).

86.     When an official could be expected to know that certain conduct would violate statutory or constitutional rights, qualified immunity requires the official to hesitate before proceeding, and a person injured thereby, may have a right of action. *Id*.

87.     Qualified immunity entails a two-prong inquiry. *Id*. at 165. The first prong is a constitutional inquiry asking whether the facts, when evaluated in the light most favorable to the injured party, establish that the official's conduct violated a constitutional right? *Id*. The second prong considers whether the right was clearly established, such that it would have been clear to a reasonable official that his or her conduct was unlawful in the situation he confronted. *Id*.

88.     The determination of whether a right was "clearly established" involves a two-part inquiry. *Id*. First, the violated right needs to be defined with the appropriate level of specificity, which is done by framing the right in case specific context, rather than a broad general proposition. *Id*.

89.     Second, is a determination whether that right was "clearly established" at the time of its alleged violation, meaning whether the right was sufficiently clear so that a reasonable official objectively would understand that he/she is violating that right. *Id*.

90.     **The Third Circuit embraces a "broad view of what constitutes an established right of which a reasonable person would have known." *Id*. at 166. A right may be clearly established "even without a precise factual correspondence between the case at issue and a previous case." *Id*.**

91.     **Indeed, "a general constitutional rule already identified in the decisional law may apply with obvious clarity to the specific conduct in question, even though 'the very action in question has [not] previously been held unlawful." *Rivas v. City of Passaic*, 365 F.3d 181, 201 (3d Cir. 2004)**.

92.     **A public official does not get the benefit of "one liability-free violation" simply because the circumstances of the case at bar are not identical to that of a prior case. *Id*.**

19

93.     **Further, in exceptional cases such as this one, the violation is readily apparent such that general statements of law may demonstrate that a right is clearly established even without factually analogous precedent.** *Id.*

94.     This case is one such case qualifying as exceptional. The New Jersey Defendants' Directive violates six clearly established rights, all of which are integrated: (1) statutory rights under the Federal Nursing Home Reform Act of 1987 ("FNHRA"); (2) the right to be free from cruel, unhuman, or degrading treatment; (3) the right to safe conditions (4) the right to life; (5) the right to bodily integrity; and (6) the right to be free from state-created danger.

95.     The constitutional analysis must begin with "the language of the instrument" which offers a "fixed standard" for ascertaining what our founding document means. *Dobbs v. Jackson Women's Health Org.*, 142 S. Ct. 2228, 2244–45, 213 L. Ed. 2d 545 (2022).

96.     Under the Fourteenth Amendment, no State shall ... deprive any person of life, liberty, or property, without due process of law." U.S. Const., Amdt. 14. Fundamental rights are defined as rights "implicit in the concept of ordered liberty or deeply rooted in this Nation's history and tradition" so as to trigger strict scrutiny. *Everest Foods, Inc. v. Cuomo*, 585 F.Supp.3d 425, 439-40 (S.D.N.Y. 2022).

97.     The Fourteenth Amendment's Due Process Clause protects substantive rights guaranteed by the first eight Amendments. *Dobbs*, *supra*, at 2246. The Due Process Clause of the Fourteenth Amendment "incorporates" the great majority of those rights and thus makes them equally applicable to the States. *Id.*

98.     No special deference is granted to the New Jersey Defendants when the exercise of emergency powers infringes on constitutional rights. *Agadath Israel of America v. Cuomo*, 983 F.3d 620, 635 (2d Cir. 2020). Courts may not defer to the New Jersey Defendants simply because they are addressing a matter involving public health. *Id.*

99.     Even in a pandemic, the Constitution "cannot be put away or forgotten." *Id*. Courts "have a duty to conduct a serious examination into the necessity of public health measures that infringe upon constitutionally protected rights." *Id.*

100.    If a statute purporting to have been enacted to protect the public health, the public morals, or the public safety, has no substantial relation to those objects, ***or is, beyond all question, a plain, palpable invasion of rights secured by the fundamental law, it is the duty of the courts to so adjudge, and thereby give effect to the Constitution***. *Jacobson v. Commonwealth of Massachusetts*, 197 U.S. 11, 31, 25 S.Ct. 358, 49 L.Ed 643 (1905). (emphasis added).

**The Directive Violates Plaintiff's Clearly Established Statutory Rights under the FNHRA**

101.    The FNHRA ensures that nursing homes receiving Medicaid funding respect and protect their residents' health, safety, and dignity.

102.    The FNHRA arises from a longstanding national commitment to provide safe and dignified care for the elderly.

103.    The FNHRA unambiguously confers and clearly establishes a myriad of federal statutory rights upon a benefitted class of individuals, to wit, elderly nursing home patients, of which Plaintiff is/was a member.

104.    Plaintiff has/had a clearly established right to be cared for in such a manner and in such an environment as will promote her quality of life. 42 U.S.C. § 1396r(b)(1)(A).

21

105.    Plaintiff has/had a clearly established right to be cared for in such a manner so as to attain and maintain the highest practicable physical, mental, and psychosocial well-being. 42 U.S.C. § 1396r(b)(2).

106.    Plaintiff has/had a clearly established right to receive nursing and related services and specialized rehabilitative services so as to attain and maintain the highest practicable physical, mental, and psychosocial well-being. 42 U.S.C. § 1396r(b)(4)(A)(i).

107.    Plaintiff has/had a clearly established right to reside in a safe, sanitary, and comfortable environment designed to prevent the development of disease and infection. 42 U.S.C. § 1396r(d)(3)(A).

108.    Plaintiff has/had a clearly established right to reside in a facility designed, constructed, equipped, and maintained in a manner to protect the health and safety of residents, personnel, and the general public. 42 U.S.C. § 1396r(d)(3)(B).

109.    Plaintiff has/had a clearly established right to a dignified existence and to be treated with dignity and care in a manner and in an environment that promotes maintenance or enhancement of her quality of life, recognizing her individuality, and with her rights protected and promoted. 42 C.F.R. § 483.10(a)(1).

110.    Plaintiff has/had a clearly established right to be treated with respect and dignity. 42 C.F.R. § 483.10(e).

111.    Plaintiff has/had a clearly established right to self-determination which includes the right to make choices about aspects of her life that are/were significant to her. 42 C.F.R. § 483.10(f)(2).

112.    Plaintiff has/had a clearly established right to receive the necessary care and services in such a manner so as to attain and maintain the highest practicable physical, mental, and psychosocial well-being. 42 C.F.R. § 483.24.

113.    Plaintiff has/had a clearly established right to reside in a safe, sanitary, and comfortable environment designed to prevent the development of diseases and infections. 42 C.F.R. § 483.80.

114.    Plaintiff has the right to use 42 U.S.C. § 1983 to enforce the aforementioned federal statutory rights unambiguously conferred and clearly established by the FNHRA. *Health and Hospital Corporation of Marion County v. Talevski*, 599 U.S. ----, — S.Ct. ----, 2023 WL 3872515 at *3 (June 8, 2023).

115.    By engaging in the course of conduct chronicled herein, the New Jersey Defendants have violated Plaintiff's clearly established rights under the FNHRA.

**The Directive Violates Plaintiff's Clearly Established Right to be Free from Cruel, Unhuman, or Degrading Treatment**

116.    American Courts have recognized that the right to be free from cruel, unhuman or degrading treatment is a universally accepted customary human rights norm. *Abebe–Jira v. Negewo*, 72 F.3d 844 (11th Cir.1996), *cert. denied*, 519 U.S. 830, 117 S.Ct. 96, 136 L.Ed.2d 51 (1996); *Najarro de Sanchez v. Banco Central de Nicaragua*, 770 F.2d 1385 (5th Cir.1985); *Jama v. U.S. I.N.S.*, 22 F. Supp. 2d 353 (D.N.J. 1998). *Xuncax v. Gramajo*, 886 F.Supp. 162 (D.Mass.1995); *Paul v. Avril*, 901 F.Supp. 330 (S.D.Fla.1994).

117.    By engaging in the course of conduct chronicled herein, the New Jersey Defendants have violated Plaintiff's clearly established right to be free from cruel, unhuman or degrading treatment.

**The Directive Violates Plaintiff's Clearly Established Right to Safe Conditions**

118.    Plaintiff, as a patient confined to a nursing home, has the clearly established right to safe conditions, defined as "the right to personal security constitutes a 'historic liberty interest' protected substantively by the Due Process Clause. *Youngberg v. Romeo*, 457 U.S. 307, 315, 102 S.Ct. 2452, 2458, 73 L.Ed.2d 28 (1982). *See also Mauro v. Cuomo*, 2023 WL 2403482 at *7 (E.D.N.Y. 2023) (Public officials are obligated to protect nursing home residents from the COVID-19 pandemic).

119.    By engaging in the course of conduct chronicled herein, the New Jersey Defendants have violated Plaintiff's clearly established right to safe conditions and personal security.

**The Directive Violates Plaintiff's Clearly Established Right to Life**

120.    The right to life is unquestionably established, as the Fifth and Fourteenth Amendments both prohibit the deprivation of the fundamental right to life without due process of law.

121.    The Fourteenth Amendment's substantive due process analysis is fully preserved for those instances in which a free citizen is denied his or her constitutional right to life through means other than a law enforcement official's arrest, investigatory stop or other seizure. *Cnty. of Sacramento v. Lewis*, 523 U.S. 833, 844–45, 118 S. Ct. 1708, 1716, 140 L. Ed. 2d 1043 (1998).

122.    The States are committed "to the protection and preservation of all human life." *Washington v. Glucksburg*, 521 U.S. 702, 710, 117 S.Ct. 2258, 2263, 138 L.Ed. 772 (1997). It is undisputed that the Due Process Clause protects an interest in life. *Cruzan by Cruzan v. Direct, Missouri Dept. of Health*, 497 U.S. 261, 281, 110 S.Ct. 2841, 2853, 111 L.Ed. 224 (1990).

123.    One's right to life is a fundamental right that cannot be submitted to a vote, and is not dependent upon the outcome of elections. *West Virginia Bd. of Educ. v. Barnette*, 319 U.S. 624, 638, 63 S.Ct. 1178, 1185-86, 87 L.Ed. 674 (1943). Additionally, Article I, Section 1 of the New Jersey State Constitution provides in pertinent part, "All persons are by nature free and independent, and have certain natural and unalienable rights, among which are those of enjoying and defending life."

124.    When a violation of federal rights protected by § 1983 causes the decedent's death, the decedent's estate is entitled to recovery for loss of life. *Banks ex rel. Banks v. Yokemick*, 177 F. Supp. 2d 239, 250 (S.D.N.Y. 2001). *See Berry v. City of Muskogee*, 900 F.2d 1489, 1501 (10th Cir. 1990) ("We are satisfied that Congress intended significant recompense when a constitutional violation caused the death of a victim. The general legislative history of the 1871 act makes clear that death was among the civil rights violations that Congress intended to remedy."); *Bass v. Wallenstein*, 769 F.2d 1173, 1189–90 (7th Cir.1985) (holding that where the constitutional violation has caused death, "state law that precludes recovery on behalf of the victim's estate for loss of life is inconsistent with the deterrent policy of section 1983.") (citing *Bell v. City of Milwaukee*, 746 F.2d 1205, 1234 (7th Cir.1984)); *Jaco v. Bloechle*, 739 F.2d 239 (6th Cir.1984); *McFadden v. Sanchez*, 710 F.2d 907, 911 (2d Cir.1983).

125.    By engaging in the course of conduct chronicled herein, the New Jersey Defendants have violated Plaintiff's clearly established right to life.

**The Directive Violates Plaintiff's Clearly Established Right to Bodily Integrity**

126.    Closely related to the right to life, is Plaintiffs' clearly established right to bodily integrity, which was violated by the Directive. Each individual has "a constitutional liberty interest in personal bodily integrity that is protected by the Due Process Clause of the Fourteenth Amendment." *Phillips v. Cty. of Allegeheny*, 515 F.3d 224, 235 (3d Cir. 2008); *Van Orden v. Borough of Woodstown*, 5 F.Supp.3d 676, 680 (D.N.J. 2014).

127.    The right to bodily integrity was violated when the Directive dramatically increased the risk of helpless nursing home patients' exposure and death from Covid. *Davis v. New York City Housing Auth.*, 379 F.Supp.3d 237, 255 (S.D.N.Y. 2019).

128.    By engaging in the course of conduct chronicled herein, the New Jersey Defendants have violated Plaintiff's clearly established right to bodily integrity.

**The Directive Violates Plaintiff's Clearly Established Right to be Free from State-Created Danger**

129.    While the government has no general duty to keep people safe, the government will assume a duty "when it affirmatively places a person in a position of danger that the person would not otherwise have faced." *Mears v. Connolly*, 24 F.4th 880, 883 (3d Cir. 2022).

130.    It is clearly established that "state actors may not abandon a private citizen in a dangerous situation, provided that the state actors are aware of the risk of serious harm and are partly responsible for creating the opportunity for that harm to happen." *L.R. v. Sch. Dist. of Philadelphia*, 836 F.3d 235, 249 (3d Cir. 2016).

131.    Where, as here, the State "either *creates dangers* that proximately cause injury or renders the victim more vulnerable to those dangers, the constitutional threshold has been met." *Gormley v. Wood-El*, 218 N.J. 72, 101, 93 A.2d 344 (2014).

132.     Through the issuance of the Directive, "having stripped them [Plaintiffs] of virtually means of self-protection [against Covid], and foreclosed their access to outside aid, the government and its officials are not free to let the state of nature take its course." *Id*. at 100.

133.     Thus the state-created danger doctrine provides an exception to that general rule that the government has no general duty to keep people safe. *Phillips*, *supra*. Plaintiff satisfies each element of the four-part test: (1) the harm ultimately caused to the plaintiff was foreseeable and fairly direct; (2) the state-actor acted in willful disregard for the plaintiff's safety; (3) there was some relationship between the state and the plaintiff; and (4) the state-actor used his authority to create an opportunity for danger that otherwise would not have existed. *Id*.

134.     Foreseeability requires the allegation that the New Jersey Defendants had "actual knowledge of or an awareness of risk that was sufficiently concrete to put them on notice of the harm." *Mears*, *supra*.

135.     It must be acknowledged that "as of November 1998, our case law had established the general proposition that state actors may not abandon a private citizen in a dangerous situation, provided that the state actors are aware of the risk of serious harm and are partly responsible for creating the opportunity for that harm to happen." *Rivas*, *supra.*

136.     The New Jersey Defendants knew of the risk that the Directive posed to Plaintiffs and all those similarly situated, yet abandoned Plaintiff in an inherently dangerous situation which resulted in the Covid deaths of Plaintiff as well as 10,000 others.

137.    In *Mears*, *supra*, at 885, the Third Circuit found foreseeability and liability, based upon the reasoning that, "Common sense tells us that it is inherently risky to leave a visitor with a violent psychiatric patient—even if that visitor is the patient's mother."

138.    Here, common sense–not to mention the concrete warnings chronicled herein–tells us that ordering the mass admission of Covid positive patients into crowded, unprepared, undersized nursing homes filled with elderly people who are the most vulnerable segment of the entire population, is "inherently risky."

139.    Having established foreseeability, the next requirement is an affirmative act. Liability is premised upon the New Jersey Defendants' affirmative acts which work to Plaintiff's detriment in terms of exposure to danger. *Phillips*, *supra*.  It is the misuse of state authority, rather than a failure to use it, that can violate the Due Process Clause. *Id*. Issuance and enforcement of the Directive is indisputably an affirmative act.

140.    Regarding the relationship requirement, Plaintiff need not plead facts that show the same "special relationship" basis for constitutional liability. *Id*. at 242. Instead, the relationship requirement "contemplates some contact such that the plaintiff was a foreseeable victim of the defendant's acts in a tort sense." *Id*.

141.    The relationship that must be established between the New Jersey Defendants and Plaintiff can be "merely" that Plaintiff were foreseeable victims, individually or as members of a distinct class. *Id*. Such a relationship may exist where the plaintiff was a member of a discrete class of persons subjected to the potential harm brought about by the state's actions. *Id*. Plaintiff is a member of a discrete class of foreseeable victims of the Directive, namely elderly nursing home patients who caught and died from Covid in the aftermath of the Directive. *See Talevski*, *supra.*

142.    The final element is a degree of culpability that "shocks the conscience." *Id*. at 240. The time in which the government actors had to respond to an incident is particularly important. *Id*. The level of culpability required to shock the conscience increases as the time state actors have to deliberate decreases. *Id*.

143.    Although intent to cause harm must be found in a "hyperpressurized environment," where, as here, officials are afforded the luxury of a greater degree of deliberation and have time to make "unhurried judgments", deliberate indifference is sufficient to support an allegation of culpability. *Id*.

144.    Deliberate indifference may exist without actual knowledge of a risk of harm when the risk is so obvious that it should be known. *Id*. at 240-41. Where the circumstances require a state actor to make something less exigent than a "split-second" decision but more urgent than an "unhurried judgment", meaning having to act "in a matter of hours or minutes" it must be considered whether a defendant disregarded a "great risk of serious harm rather than a substantial risk." *Id*. at 241.

145.    Hence there are three possible standards that can be used to determine whether state action shocked the conscience: (1) deliberate indifference; (2) gross negligence or arbitrariness that indeed shocks the conscience; or (3) intent to cause harm. *Id*.

146.    While the New Jersey Defendants claim that they were acting in a "hyperpressurized environment", they were not as a matter of law, as  they had sufficient time to proceed deliberately. *Id*.  They neither had to make a "split-second" decision, nor an "unhurried judgment", nor did they have to act "in a matter of hours or minutes." *Id*.

147.    The time available to the New Jersey Defendants for purposes of preemptively avoiding the inevitable carnage of the Directive, is nowhere comparable to a "high speed chase or prison riot." *Van Orden*, *supra*, at 683. Thus in order to "shock the conscience", the New Jersey Defendants need only have acted with "deliberate indifference." *Phillips*, *supra*.

148.    The facts conclusively establish that the New Jersey Defendants' promulgation of the Directive was a depraved act of deliberate indifference:

- ·    ***They knew*** that the Directive would lead to unnecessary deaths, as it is indisputable that the elderly are the most vulnerable to the ravages of Covid, and the most likely to die en masse due to a Covid outbreak. (¶12).

- ·    ***They knew*** that people would "die" should the infected residents be admitted. (¶13).

- ·    ***They knew*** that they were told by a nursing home administrator that, "People will die .... You understand that by asking us to take Covid patients that patients will die in nursing homes that wouldn't have otherwise died had we screened them out." (¶14).

- ·    ***They knew*** that after Commissioner Persichilli shared guidelines for separating returning residents and their caretakers, an administrator replied, "You have asked us to separate safely and create our own wing to take on COVID-19's from the hospital .... The problem, of course, is there is no separating safely .... It's almost certain that even though you have staff on that unit, something will migrate." (¶15).

- ·    ***They knew*** that within two days after the Directive was implemented, the New Jersey Department of Health was inundated with calls from 99 facilities stating that they did not have enough resources to properly staff or separate patients. Within a week, 200 facilities notified the New Jersey Department of Health that they could not accept new admissions. (¶16).

- ·    ***They knew*** that just a day after Commissioner Persichilli issued the Directive, three organizations,  The Society for Post-Acute and Long-Term Care Medicine ("AMDA"), the National Center for Assisted Living ("NACL"), and American College of Health Care Administrators ("CHCA"), all describing themselves as dedicated to preserving the safety of patients, residents, and other long-term care facilities, issued a dire warning about New York's directive, from which Commissioner Persichilli's Directive is modeled. (¶17).

- ***They knew*** that these experts urged other states not to enforce the kind of policy being implemented in New York and New Jersey, as they presented COVID data from the Washington State nursing home which was ravaged by Covid, and explained why a one-size fits all approach statewide could be dangerous. (¶18).

- ***They knew*** that these experts issued a joint statement stating, "We strongly object to this policy directive and approach to developing surge capacity. We are aware that other states may already be adopting a similar approach in order to free up hospital beds. This is a short-term and short-sighted solution that will only add to the surge in COVID-19 patients that require hospital care. Based upon what we **currently know** about how this virus can spread in institutional settings, the hospitalizations and case fatality rate, this action by a state will put the many frail and older adults who reside in nursing homes at risk." (¶19).

- ***They knew*** that these experts went on to advocate the creation of separate settings for recovering Covid patients, including large field hospitals, dormitories, hotels, and shuttered nursing homes or hospitals. In other words, keep the virus out of facilities by isolating Covid positive patients from the extremely vulnerable elderly. (¶20).

- ***They knew*** that they could not credibly claim that there was no alternative to the Directive, as they knew that there were multiple viable alternatives, but ignored them to the detriment of Plaintiffs and 10,000 other elderly and infirm nursing home patients who died horrible Covid deaths while scared and alone. (¶21).

- ***They knew*** that their refusal to have hospitals test patients during discharge greatly exacerbated the disaster, as the combination of staff who live in the community, going home and coming back to the building, combined with the positivity rate in these communities, especially in 'hot spots', strongly contributed to the high rate of deaths, after patients were admitted and re-admitted while not knowing whether they had Covid because they were prohibited from being tested. (¶22).

- ***They knew*** from the outset that the Directive was completely unworkable as they knew that most nursing homes are small, older buildings without upgraded ventilation. (¶23).

- ***They knew*** that the nursing homes, eager for new revenue that came with hospital patients, would gladly accept this patients, yet the New Jersey Defendants did nothing substantive to prevent the deadly combination of inadequate facilities with an overflow of Covid patients and that the Directive would encourage this deadly combination. (¶24).

- ***They knew*** that on March 18, 2020, the CDC in a study of the nation's first large outbreak in the Kirkland, Washington nursing home, told health officials, "Substantial morbidity and mortality might be averted if all long-term care facilities take steps now to prevent exposure of their residents to COVID-19."(¶25).

- ***They knew*** that they were forewarned by Washington State, and were forewarned by Italy where it was learned that the disease was ravaging the elderly population with an average age of death being 81.(¶26).

- ***They knew*** that the single greatest error of America's response to the pandemic in nursing homes, was the failure to provide early and vast access to virus testing for residents and staff and without testing, nursing home staff focused on isolating residents who showed symptoms of the virus, while asymptomatic residents and staff continued to spread the virus throughout the facilities. In other words, without widespread testing, efforts to stop the spread were doomed. (¶27).

- ***They knew*** that they had no plan in place to distribute personal protective equipment ("PPE") equipment to nursing homes in the early days of the crisis, as there was a breakdown in communications between such facilities and government officials. (¶28).

- ***They knew*** that New Jersey's long-term care facilities did not have sufficient supplies of PPE or the ability to manage the highly infectious patients that the New Jersey Defendants were forcing them to accept from hospitals, yet they implemented the Directive anyway. (¶29).

- ***They knew*** they were not going to call upon the top experts in the New Jersey Department of Health to guide the decision-making of our leaders, as the top brass specifically asked them to "avoid putting any concerns in email." (¶31).

- ***They knew*** that they were making things up as they went along, and making decisions while justifying them on the back end. (¶32).

- ***They knew*** that there was not enough Personal Protective Equipment ("PPE") and test kits for long-term care centers towards the end of March, 2020. (¶33).

- ***They knew*** that without having that critical testing information, and the PPE to be able to protect staff, nursing home residents would face devastating outcomes. (¶34).

- ***They knew*** that Commissioner Perischilli pressured subordinates to relax standards for testing, so that nursing home staff could be given the authority to test with the paltry PPE supplies offered by the State Office of Emergency Management. (¶35).

- *They knew* that all of this was in service to the Governor Murphy's arbitrary testing goals (set with political lenses in mind), without regard for the safety of those who needed to do the testing, as The State OEM office then used arbitrary allocation guidelines that short-changed nursing homes, where the most vulnerable New Jersey residents live when it comes to this virus. (¶36).

- *They knew* that it was a complete failure to ignore long-term care testing until late April, 2020. (¶37).

- *They knew* that very few of these nursing homes were tangibly ready to take these residents back based on Commissioner Persichilli's criteria set forth in the Directive, because the State failed to allocate enough PPE and staffing resources to them to do so, and with Commissioner Persichilli, a former hospital CEO at its helm, the Department of Health was only focused on the acute care hospital piece of the health care system. (¶38).

- *They knew* that experts were recommending that the PPE allocation system prioritize long-term care centers with vulnerable populations, but those voices were suppressed by the New Jersey Defendants and/or their delegees. (¶39).

- *They knew* that several Department of Health employees, were punished, suppressed, or otherwise reprimanded for using their public health expertise to recommend the right course of action. (¶40).

- *They knew* that the combination of a lack of action where it should have been seen, and a willful desire to focus only on where most media attention was afforded during the peak of the crisis (the general public and hospitals), caused preventable deaths in long-term care, resulting in the preventable deaths of Plaintiffs. (¶41).

- *They knew* that Commissioner Persichilli was creating layers in the Department of Health between her and the experts (rather than elevating the voices that could have resulted in a better response), and  due to the emergence of a toxic culture of infighting in Governor Murphy's administration that prevented the right decisions from being made early enough to have an impact. (¶42).

- *They knew* that deespite all of these warnings, and all of the insurmountable real world logistical obstacles, they were dogmatically in a tone-deaf fashion, going to exercise deliberate indifference by implementing the Directive anyway. (¶43).

- *They knew* that they had all of the expert information on what to do, were warned, resulting in the nursing homes being thrown under the bus. (¶44).

149.   These facts conclusively establish that the New Jersey Defendants not only foresaw the danger of harm their actions presented, but were deliberately indifferent in enacting and enforcing the Directive, and promulgated the Directive without a rational basis. *Phillips*, *supra*. The determination of whether Plaintiff alleged an action which "shocks the conscience", does not contain a requirement that the New Jersey Defendants knew that their actions were conscience shocking.

150.   At bare minimum, because there are factual disputes relevant to the qualified immunity analysis, it is premature to make a decision on qualified immunity at the motion to dismiss stage. *Phillips*, *supra*, at 242 n.7; ***In re Flint Water Cases*, 960 F.3d 303, 331 (6th Cir. 2020)(Facts regarding the Governor's request for qualified immunity are "to be fleshed out during discovery and are not appropriate to resolve at the motion to dismiss posture)**; *Bradshaw v. Twp. of Middletown*, 296 F. Supp. 2d 526, 550 (D.N.J. 2003), *aff'd sub nom*, *Bradshaw v. Twp. of Middleton*, 145 F. App'x 763 (3d Cir. 2005)(Qualified immunity determination cannot be made without factual determinations as to the officials' subjective beliefs and motivations); *Jama*, *supra*, at 370-71.

151.   By engaging in the course of conduct chronicled herein, the New Jersey Defendants have violated Plaintiff's clearly established right to be free from State Created Danger.

152.   By egregiously depriving Frances of multiple clearly established constitutional rights in a manner that shocks the conscience, the New Jersey Defendants have violated her Fourteenth Amendment right to substantive due process.

153.   Based upon the foregoing, Frances suffered a forseeable and fairly direct harm, namely her death from Covid as a result of the Directive ordering that post-acute care facilities such as Gateway, are expressly prohibited from denying admission or re-admission of patients/residents who

have tested positive for Covid, while also prohibiting post-acute care facilities such as Gateway from requiring a hospitalized patients/residents who were determined to be "medically stable", to be tested for Covid prior to admission/re-admission.

154.   The New Jersey Defendants acted with a degree of culpability that shocks the conscience. Despite all of the warnings, and all of the insurmountable real world logistical obstacles, the New Jersey Defendants dogmatically in tone-deaf fashion, exercised deliberate indifference by implementing the Directive anyway.

155.   Frances, as a nursing home patient, was a foreseeable victim and/or member of a discrete class of persons harmed by the New Jersey Defendants' actions.

156.   Through the Directive, the New Jersey Defendants affirmatively used their authority to create a danger of Frances catching and dying from Covid and/or made Frances more vulnerable to that danger if they had not acted at all.

157.   The New Jersey Defendants are therefore liable for violation of all of the aforementioned clearly established constitutional rights, especially under the State Created Danger Doctrine.

158.   The New Jersey Defendants, by engaging in the course of conduct chronicled herein, while acting under the color of state law, have individually and collectively deprived Frances of federal statutory and constitutional rights in violation of 42 U.S.C. § 1983.

## SECOND COUNT

### (New Jersey Civil Rights Act - N.J.S.A. 10:6-2(c) - the New Jersey Defendants)

159.    Plaintiff repeats, realleges, and re-emphasizes the allegations set forth in Paragraphs 1 through 158  as if set forth herein full, and as the basis for this claim.

160.    By engaging in the aforementioned course of conduct under the color of state law, and by causing Frances to be deprived of her constitutionally guaranteed rights secured and guaranteed under the Fifth and Fourteenth Amendments of the United States Constitution, and corresponding rights guaranteed by the New Jersey State Constitution, the New Jersey Defendants have violated the New Jersey Civil Rights Act, N.J.S.A. 10:6-2(c).

161.    The New Jersey Defendants, by engaging in the course of conduct chronicled herein, while acting under the color of state law, have individually and collectively deprived Frances of constitutional rights in violation of N.J.S.A. 10:6-2(c).

## THIRD COUNT

### (New Jersey Nursing Home Resident Rights Act - the Nursing Home Defendants)

162.    Plaintiff repeats, realleges, and re-emphasizes the allegations set forth in Paragraphs 1 through 161 as if set forth herein full, and as the basis for this claim.

163.    At all times relevant hereto, Frances was a "resident" of Gateway within the meaning and intent of N.J.S.A. 30:13-2(e).

164.    At all times material hereto, pursuant to N.J.S.A. 30:13-1, et seq., the Nursing Home Defendants, by and through their employees/agents, were at all times required to comply with the New Jersey Nursing Home Resident Rights Act, specifically including, without limitation, N.J.S.A. 30:13-5(j), which conveyed unto Frances:

a.   The right to "a safe and decent living environment"

b.   The right to receive "considerate and respectful care"

c.   The right to receive care which preserved her "dignity"

d.   The right to receive care which was tailored to preserve her unique and specific needs and thus her "individuality:

e.   The right "to expect and receive appropriate assessment"

f.   The right to appropriate "management and treatment" of her specific conditions; and

g.   The right to receive "care consistent with sound nursing and medical practices."

165.   At all times material hereto, the Nursing Home Defendants by, through and including their affiliated officers, agents, servants, employees and/or apparent or ostensible agents, grossly negligently failed to protect, preserve and/or otherwise provide for the rights of Frances, as enumerated in N.J.S.A. 30:13-1, et. seq. and New Jersey Common Law, and violated said rights, specifically including, without limitation, her aforesaid rights under N.J.S.A. 30:13-5(j) in ways which include, but are not limited to, one or more of the following:

a.   By depriving Frances of care necessary for her health, safety and welfare;

b.   By subjecting Frances to abuse in the form of intentional deprivation of care, services, and resources necessary to meet her individual needs and provide a safe, decent and dignified living environment;

c.   By knowingly operating the subject nursing home in a manner violative of applicable state and/or federal regulations necessary to a safe, decent, and dignified living environment; and/or

d.   In otherwise failing to exercise reasonable care toward Frances.

166. As a direct and proximate result of the violations of N.J.S.A. 30:13-1, et seq., committed by the Nursing Home Defendants, by, through and including their affiliated officers, agents, servants, employees and/or apparent or ostensible agents, Frances, was forced to live in an unsafe environment, was provided with deficient care resulting in physical harm, suffered deprivation of dignity, and other violations of her rights guaranteed by New Jersey State and/or Federal law, and further sustained the various harms and losses outlined more fully elsewhere in this Complaint.

167. The grossly negligent acts and omissions of the Nursing Home Defendants, by, through and including their affiliated officers, agents, servants, employees and/or apparent or ostensible agents, violated N.J.S.A. 30:13-1, et seq., including N.J.S.A. 30:13-5(a-m), and are sufficient under New Jersey Common Law, Federal Law, and under N.J.S.A. 30:13-4.2 and N.J.S.A. 30:13-8, to constitute a claim and authorizing Plaintiff to seek compensatory damages, consequential damages, punitive damages, attorney's fees, interest, and costs of suit.

168. Said Nursing Home Defendants, by engaging in the course of conduct chronicled herein, have individually and collectively violated the New Jersey Nursing Home Act.

### FOURTH COUNT

### (Gross Negligence - the Nursing Home Defendants)

169. Plaintiff repeats, realleges, and re-emphasizes the allegations set forth in Paragraphs 1 through 168 as if set forth herein full, and as the basis for this claim.

170. By engaging in the course of conduct chronicled herein, the Nursing Home Defendants created an unreasonable risk of harm to Frances by failing to exercise slight care or diligence, and Frances's death from Covid was the natural and probable result of the Nursing Home Defendants' failure to exercise slight care or diligence.

171.    The Nursing Home Defendants, by engaging in the course of conduct chronicled herein, have engaged in gross negligence.

### FIFTH  COUNT

### (Wrongful Death - the Nursing Home Defendants)

172.    Plaintiff repeats, realleges, and re-emphasizes the allegations set forth in Paragraphs 1 through 171 as if set forth herein full, and as the basis for this claim.

173.    As a further direct and proximate result of the grossly negligent acts and conduct of the Nursing Home Defendants as aforesaid, by, through and including their affiliated officers, agents, servants, employees and/or apparent or ostensible agents, Frances suffered various harms and losses, including without limitation, contacting Covid, which contributed to her physical decline, and, ultimately, her untimely death.

174.    Frances left behind family members who have and will continue to be deprived of the comfort, society, companionship, and/or guidance and/or support of Frances.

175.    Plaintiff brings this claim pursuant to the provisions of the New Jersey Wrongful Death Act, N.J.S.A. 2A:31-1 et. seq., for the benefit of the next of kin of Frances, pursuant to N.J.S.A. 2A:15-3.

176.    The Nursing Home Defendants, by engaging in the course of conduct chronicled herein, have caused Frances's wrongful death.

## REQUESTED RELIEF

WHEREFORE, Plaintiff demands judgment as follows, jointly and severally against the New

Jersey Defendants and the Nursing Home Defendants:

a.       compensatory damages;

b.       consequential damages;

c.       punitive damages;

d.       costs of suit;

e.       interest;

f.       statutory attorneys fees; and

g.       such other relief as the Court deems necessary and just.

MICHAEL S. KASANOFF, LLC
Attorney for Plaintiff The Estate of Frances D. DeRosa

Dated: June 11, 2023          S/      Michael S. Kasanoff
                                       Michael S. Kasanoff (MK 7133)

## CERTIFICATION OF NO PENDING ACTIONS

Pursuant to L. Civ. R. 11.2, Plaintiff certifies that to the best of Plaintiff's knowledge

information and belief, there are two other pending court actions/proceedings involving the parties

and/or subject matter of this case, *Estate of Margaret MacKenzie v. Phillip D. Murphy, et. al. Civ. No.:*

*3:22-cv-02500(GC)(RLS)* ("*MacKenzie*"), and *Estate of Russell Murray v. Phillip D. Murphy, et. al. Civ.*

*No.: 3:22-cv-03542(FLW)(TJB)* ("*Murray*"). Both *MacKenzie* and *Murray* should be consolidated with

this action as the allegations against the New Jersey Defendants are exactly the same, counsel for the

parties is exactly the same, and Plaintiff's counsel plans to amend the Complaints in *MacKenzie* and

*Murray* to mirror this Amended Complaint.

40

MICHAEL S. KASANOFF, LLC
Attorney for Plaintiff The Estate of Frances D. DeRosa

Dated: June 11, 2023          S/_____Michael S. Kasanoff_____
                              Michael S. Kasanoff (MK 7133)

## **ARBITRATION CERTIFICATION**

Pursuant to L. Civ. R. 201.1, the amount in controversy exceeds $150,000.00.

MICHAEL S. KASANOFF, LLC
Attorney for Plaintiff The Estate of Frances D. DeRosa

Dated: June 11, 2023          S/_____Michael S. Kasanoff_____
                              Michael S. Kasanoff (MK 7133)

## **JURY DEMAND**

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiff hereby demands a trial

by jury of all of the claims so triable alleged herein.

MICHAEL S. KASANOFF, LLC
Attorney for Plaintiff The Estate of Frances D. DeRosa

Dated: June 11, 2023          S/_____Michael S. Kasanoff_____
                              Michael S. Kasanoff (MK 7133)

41